IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EDWARD TERRAN FURNACE,<br><br>Plaintiff,<br><br>v.<br><br>PAUL SULLIVAN, Correctional Officer, et al.,<br><br>Defendants.<br>_____ | No. C 07-4441 MMC (PR)<br><br>**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**<br><br>**(Docket No. 21)** |

On August 28, 2007, plaintiff, a California prisoner then incarcerated at Salinas Valley State Prison ("SVSP") and proceeding pro se, filed the above-titled civil rights action under 42 U.S.C. § 1983.[1]  Now pending before the Court is defendants' motion for summary judgment on plaintiff's claims alleging the violation of his right to equal protection under the Fourteenth Amendment, and the violation of his Eighth Amendment right to be free from the use of excessive force.  Plaintiff has opposed the motion and defendants have filed a reply.

**FACTUAL BACKGROUND[2]**

The acts giving rise to the instant action took place in May 2005, at which time

---

[1] Plaintiff currently is incarcerated at Corcoran State Prison.

[2] The following facts are derived from plaintiff's verified amended complaint ("AC") and the parties' evidence submitted in support of and in opposition to the motion for summary judgment.  See Schroeder v. McDonald, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (holding verified complaint may be used as opposing affidavit under Rule 56 if based on personal knowledge and sets forth specific facts admissible in evidence).

1 plaintiff was housed in building D-5, cell 122 at SVSP. (Dep. E. Furnace in Supp. Mot.
2 Summ. J. ("Pl.'s Dep.") at 26:3-14; 34:9-15.) Plaintiff is a practitioner of the religion of
3 "Shetaut Neter," which mandates a vegetarian diet for all of its practitioners. (AC ¶ 12.)

4     On the morning of May 22, 2005, plaintiff was locked in his cell with his cellmate,
5 waiting for correctional staff to bring their breakfast trays. (Pl.'s Dep. at 26:3-20.) At SVSP,
6 food is distributed to inmates through a food/handcuff port that is a slot, approximately
7 eighteen inches wide and seven or eight inches high, that is cut into the door and has a metal
8 cover that opens from the outside. (Id. at 69:15-19 & Exs. 5-10.) Correctional staff at SVSP
9 are trained that inmates who take control of food ports and refuse to allow staff to close the
10 ports present a serious security threat to the institution because hazardous or dangerous items
11 can be thrown or passed through the port. For these reasons, staff are directed to
12 immediately regain control of food ports, and are authorized to use chemical agents, like
13 pepper spray, for this purpose. At SVSP, these directives are set down in Operational
14 Procedure 29 ("OP 29"). (Decl. D.R. Morales Supp. Mot. Summ. J. ("Morales Decl.") ¶ 17.)

15     Defendants D.R. Morales ("Morales"), P. Sullivan ("Sullivan") and J. Soto ("Soto")
16 were three of the officers involved in distributing breakfast trays in plaintiff's building on
17 May 22, 2005. None of the defendants was regularly assigned to building D-5 at that time,
18 plaintiff had never seen any of the defendants before, and defendants were not familiar with
19 plaintiff. (Pl.'s Dep. at 37:18-25; Morales Decl. ¶ 4; Decl. P. Sullivan Supp. Mot. Summ. J.
20 ("Sullivan Decl.") ¶ 9.)

21     Inmates must be approved to receive a vegetarian meal and, at the time of the events at
22 issue herein, correctional staff relied on signs posted on the doors of the inmates' cells to
23 ascertain whether an inmate had been approved to receive a vegetarian meal. (Morales Decl.
24 ¶ 4; Decl. J. Soto Supp. Mot. Summ. J. ("Soto Decl.") ¶ 5.) Defendant Morales was assigned
25 to distribute breakfast trays to plaintiff's cell and did not see a sign on plaintiff's cell
26 designating plaintiff as a vegetarian and did not know plaintiff's meal status or religious
27 affiliation. (Morales Decl. ¶ 4.) Plaintiff, however, previously had been approved to receive
28 a vegetarian meal for religious reasons and had been given a "chrono," i.e., a note,

2

memorializing the authorization.  (AC ¶ 13.)  On the morning of May 22, 2005, plaintiff had a copy of the chrono in his cell.  (Pl.'s Dep. at 62:11-18, 64:1-6.)

The parties' accounts differ as to what happened after Morales approached plaintiff's cell to distribute breakfast trays to plaintiff and his cellmate.

A.      Plaintiff's Facts

Morales approached plaintiff's cell by himself, holding a large tray, approximately three feet by three feet, with two or three food trays on it.  (Pl.'s Dep. at 26:19-21, 44:25-45:10.)  Plaintiff heard Morales "say something [that] sounded negative."  (Id. at 26:20-21.)  Plaintiff could not make out what Morales said, however, because plaintiff wasn't paying attention at that point.  (Id. 40:6-41:3.)  Although he is "not really sure," plaintiff "believe[s] [Morales] said something about all these Muslims, or something like that, in this building."  (Id. 26:21-24.)  Plaintiff thinks Morales might have said "[W]hat's up with all the fucken Muslims over here."  (Id. 40:6-12.)  Morales did not, however, specifically say anything derogatory about plaintiff or plaintiff's breakfast tray.  (Id. at 40:22-41:19.)

Plaintiff thinks Morales might have made the above-noted derogatory comment because Morales "had a problem" with providing religious no-meat trays to the Muslims at SVSP, or because "he's probably a racist."  (Id.)  Plaintiff thinks it is probable that Morales is a racist, based on plaintiff's belief that the hostility between Black, White and Hispanic gang members outside of prison continues in the prison setting, and affects inmates as well as correctional staff.  (Id. at 41:20-42:5.)

Upon approaching plaintiff's cell, Morales held the large food tray balanced in one hand and opened the food port in the front of plaintiff's cell door with the other.  (Id. at 55:18-56:2.)  Plaintiff could see that the trays Morales had with him were non-vegetarian, so plaintiff requested two vegetarian trays from Morales.  Plaintiff believes Morales replied, "[Y]ou guys ain't vegetarian," and then closed the food port and stepped out of plaintiff's view to speak with defendant Soto.  Morales returned to plaintiff's cell and told plaintiff that Soto had said plaintiff and his cellmate did not get vegetarian trays.  Plaintiff then asked Morales to call Soto down to plaintiff's cell so plaintiff could ask Soto about the vegetarian

3

food tray. Morales refused to do so and, instead, directed plaintiff to take the trays and informed plaintiff that if he did not do so plaintiff would be marked down as refusing his meal. (Id. at 26:25-27:10, 58:5-23.)

Plaintiff did not take the non-vegetarian meal trays; instead, plaintiff put his hand on the food port and tried to call Soto. (Id. at 59:4-5.) Specifically, in getting ready to call to Soto, plaintiff squatted down and put his hand on the bottom part of the already open food slot for balance. (Id. at 69:23-70:1.) He used his fingertips to hold onto the slot and did not stick his hand or arm outside of the slot. (Id. at 70:2-4, 117:21-118:1.)

At that point, without saying anything, defendant Morales started pepper spraying plaintiff. (Id. at 27:10-11, 59:6-7.) In an attempt to block the pepper spray, plaintiff stuck his hand out of the food port and grabbed the tray slot. (Id. at 59:21-60:5.) Morales then told plaintiff to let go of the food port, but plaintiff did not do so because he was continuing to attempt to block the pepper spray. (Id. at 60:6-:16.) Defendant Sullivan then came over and started pepper spraying plaintiff as well. (Id. at 60:16-19.) Plaintiff does not recall Sullivan saying anything specific to him, but he supposes Morales and Sullivan were "probably" telling him to release the tray slot. (Id. at 61:1-10.) Morales ran out of pepper spray and Sullivan continued spraying. (Id. at 60:23-25.) Plaintiff was pepper sprayed for "maybe a minute," (id. at 51:5-9), and the entire incident, from the time Morales made the derogatory remark until the pepper spraying stopped, lasted no more than a couple of minutes (id. at 27:25-28:3, 50:11-51:7). With respect to the pepper spraying itself, plaintiff "[doesn't] know how long it took," but "because they stopped spraying," plaintiff assumed the officers had run out of pepper spray. (Id. at 27:15-24; 51:5-19.) Morales and Sullivan then walked away. (Id. at 67:10:15.) Officer Soto did not pepper spray or speak to plaintiff during the incident. (Id. at 50:1-3, 64:25-65:6.)

Shortly after the incident, plaintiff spoke to a correctional sergeant; the sergeant asked plaintiff if plaintiff had a vegetarian food chrono and plaintiff said he did and showed the chrono to the sergeant. (Id. at 70:25-71:5.) Plaintiff did not show the food chrono to any of the defendants because he did not have time to do so. (Id. at 69:2-9.)

4

1    Plaintiff was seen by a medical technical assistant ("MTA") who arrived with the
2 sergeant.  Plaintiff spoke with the MTA for a few minutes and was given instructions on how
3 to decontaminate himself.  (Id. at 68:6-25.)  Plaintiff did not complain to the MTA about any
4 injuries or request any medical assistance.  (Id. at 73:17-74:5.)  Plaintiff then decontaminated
5 himself using water, iodine, a dry towel and some cocoa butter cream.  (Id. at 74:9-15.)  The
6 pepper spray caused plaintiff's skin to blister and burn.  (Id. at 74:18-75:3.)  The effect of the
7 pepper spray lasted for three or four days.  (Id. at 75:8-17.)  After the above events, plaintiff
8 had a rash in his groin area that he believes might be attributable to the pepper spray incident.
9 (Id. at 75:18-21; 78:13-18.)

10  B.    Defendants' Facts

11    Morales did not see a sign on plaintiff's cell designating him as a vegetarian;
12 consequently, Morales assumed plaintiff did not receive a vegetarian tray.  As Morales
13 approached plaintiff's cell, however, plaintiff informed Morales that plaintiff was a
14 vegetarian.  (Morales Decl. ¶ 5.)

15    Soto was standing some distance away from plaintiff's cell.  Soto was a relief floor
16 officer who had started working in Building D-5 in April 2005, and, on average, worked
17 there three days a week.  (Soto Decl. ¶ 3.)  Because Morales was not regularly assigned to
18 plaintiff's building and did not know the inmates there, Morales checked with Soto, whom he
19 assumed would know plaintiff's meal status.  (Morales Decl. ¶ 6.)  Soto told Morales that
20 plaintiff was not approved to receive a vegetarian meal.  (Id. ¶ 7.)  Correctional staff at
21 SVSP, including Morales, are trained to give vegetarian meals only to those inmates
22 authorized to receive them.  (Id. ¶ 14.)

23    Morales returned to plaintiff's cell and offered him a non-vegetarian tray.  Plaintiff
24 reiterated that he was a vegetarian, and Morales responded that Soto said that plaintiff was
25 not.  Morales offered to return to Soto a second time to verify whether plaintiff had a
26 vegetarian chrono.  In response, plaintiff abruptly forced the food port open, yelling "fuck
27 you!"  (Id. ¶ 8.)

28    Morales instructed plaintiff to surrender the food port, and told him he had ten

5

seconds to comply with that direct order. Plaintiff again responded "fuck you" and did not let go of the food port. In accordance with SVSP food port procedures, Morales then sprayed plaintiff once with pepper spray to gain his compliance. Because the canister lacked pressure, Morales ran out of pepper spray after he discharged a one-second burst. (Id. ¶ 9.)

Defendant Sullivan, who also was assisting with serving breakfast in plaintiff's building but was directly in front of plaintiff's cell, saw Morales struggling with trays of food, saw plaintiff's arm go through the food port and take hold of the food port, heard Morales order plaintiff to release the food port and, when plaintiff did not comply, saw Morales take out his pepper spray canister. At that point, Sullivan ran to plaintiff's cell to assist Morales. (Sullivan Decl. ¶ 7.)

Sullivan saw Morales pepper spray plaintiff through the food port. Seeing that Morales was struggling, trying to utilize his pepper spray canister with one hand while balancing some food trays with his other hand, Sullivan also ordered plaintiff to remove his arm from the food port. When plaintiff did not follow Sullivan's order, Sullivan dispersed one burst of pepper spray at plaintiff though the food port. Plaintiff then removed his arm from the food port, at which point Sullivan stopped pepper spraying plaintiff and shut the food port. (Id. ¶¶ 6-8.)

Soto did not speak to plaintiff during the entire incident and did not pepper spray plaintiff. (Pl.'s Dep at 50:1-3, 64:25-65:6.)

Although plaintiff had his vegetarian meal chrono in his cell and showed it to a correctional sergeant immediately after the incident, at no time did plaintiff tell defendants that he had a vegetarian meal chrono or offer to show them documentation of his meal status. (Id. at 67:16-23, 69:2-9, 70:25-71:5; Morales Decl. ¶ 12.)

Following the incident, plaintiff was issued a rules violation report for disobeying an order and taking control of the food port. (Decl. J. Zelidon-Zepeda ("Zelidon-Zepeda Decl.") Supp. Mot. Summ. J. Ex. 1 at 2.) After a hearing, plaintiff was found guilty of the charge. (Id.) Additionally, the report noted that plaintiff "appear[ed] to be instructing another witness to fabricate a story." (Id.) With regard to the latter notation, plaintiff, in connection

6

1 with the hearing, attempted to call a witness on his behalf. (Id.) Before the hearing, plaintiff
2 wrote a note to the witness, telling the witness what plaintiff wanted him to say. (Pl.'s Dep.
3 at 102:11-103:11, 111:17-112:12 & Ex. 4.) Specifically, plaintiff instructed the witness:
4 "[A]ll I need you to say is that, "you heard c/o Morales say that either you take this tray or
5 I'll mark you down as refusing, then you heard me call out one time for c/o Soto, then heard
6 and smelled pepper spray being used." (Pl.'s Dep. Ex. 4.)

7     In accordance with SVSP regulations governing the use of force, a committee
8 conducted an investigation into the pepper spray incident. (Morales Decl. ¶ 16; Sullivan
9 Decl. ¶ 11.) After reviewing the contemporaneous reports of the incident prepared by
10 Morales and Sullivan, the committee determined the actions of Morales and Sullivan were
11 proper in light of the circumstances. (Id.)

**DISCUSSION**

13 A.    Plaintiff's Motion to Strike

14     Together with his opposition to defendants' motion for summary judgment, plaintiff
15 has filed a motion to strike Exhibit 1 to the declaration of defendants' counsel Jose A.
16 Zelidon-Zepeda, submitted with defendants' motion for summary judgment. Exhibit 1 is a
17 copy of the rules violation report for disobeying a direct order, which report was issued to
18 plaintiff after the May 22, 2005 incident that gave rise to the instant action. Plaintiff
19 contends the exhibit is irrelevant and inadmissible character evidence.

20     Defendants argue that plaintiff's objection lacks merit because the report is relevant to
21 a determination of the instant case and is not being offered as character evidence.

22     Under Rule 401 of the Federal Rules of Evidence, relevant evidence is "evidence
23 having any tendency to make the existence of any fact that is of consequence to the
24 determination of the action more probable or less probable." Fed. R. Evid. 401. Under Rule
25 404 of the Federal Rules of Evidence, however, evidence of a "person's character or trait of
26 character" is inadmissible "for the purpose of proving action in conformity therewith on a
27 particular occasion." Fed. R. Evid. 404(a).

28     Here, the report describes plaintiff's actions during, and statements about, the event in

7

question, not plaintiff's conduct on some other occasion or a general character trait, e.g., any history of disobedience or character for violence.  Consequently, the Court finds the report does not constitute character evidence.  To the extent the findings in the report arguably have a tendency to support any particular factual finding on a disputed matter herein, however, the report, for purposes of the instant motion, nonetheless cannot be considered, for the reason that this Court, as noted, is not entitled to make credibility determinations in ruling thereon. Moreover, findings by a public office or agency are only admissible if based on an "investigation made pursuant to authority granted by law," see Fed. R. Evid. 803(8), and defendants have cited no such authority in connection with their submission of the subject report.

Accordingly, as the Court has not relied on the rules violation report, plaintiff's motion to strike such evidence is denied as moot.

B.     Motion for Summary Judgment

    1.     Legal Standard

Summary judgment is proper where the pleadings, discovery and affidavits show there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  See Fed. R. Civ. P. 56(c).  Material facts are those that may affect the outcome of the case.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  See id.

The court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . ,since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); see also Anderson v. Liberty Lobby, 477 U.S. at 248 (holding fact is material if it might affect outcome of suit under governing law; further holding dispute about material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving

8

1 party"). The moving party bears the initial burden of identifying those portions of the record 2 that demonstrate the absence of a genuine issue of material fact. The burden then shifts to 3 the nonmoving party to "go beyond the pleadings, and by his own affidavits, or by the 4 'depositions, answers to interrogatories, or admissions on file,' designate 'specific facts 5 showing that there is a genuine issue for trial.'" See Celotex, 477 U.S. at 324 (citing Fed. R. 6 Civ. P. 56(e)).

7 In considering a motion for summary judgment, the court must view the evidence in 8 the light most favorable to the nonmoving party; if, as to any given fact, evidence produced 9 by the moving party conflicts with evidence produced by the nonmoving party, the court 10 must assume the truth of the evidence set forth by the nonmoving party with respect to that 11 fact. See Leslie v. Grupo ICA, 198 F.3d 1152, 1158 (9th Cir. 1999). The court's function on 12 a summary judgment motion is not to make credibility determinations or weigh conflicting 13 evidence with respect to a disputed material fact. See T.W. Elec. Serv. v. Pacific Elec. 14 Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).

15     2.    Equal Protection Claim

16 Plaintiff claims his right to equal protection was violated by defendants' actions 17 because defendants did not provide him with a religious breakfast tray while providing the 18 same to other inmates who were similarly situated.

19 "The Equal Protection Clause requires the State to treat all similarly situated people 20 equally." Shakur v. Schriro, 514 F.3d 878, 891 (9th Cir. 2008). To state a 42 U.S.C. § 1983 21 claim for violation of the Equal Protection Clause, a plaintiff must show that the defendants 22 acted with an intent or purpose to discriminate against the plaintiff based upon membership 23 in a protected class. Lee v. City of Los Angeles, 250 F.3d 668, 686 (9th Cir.2001) (internal 24 quotation and citation omitted).

25 The first step in equal protection analysis is to identify the relevant class. Thornton v. 26 City of St. Helens, 425 F.3d 1158, 1166 (9th Cir. 2005.) In particular, the class must be 27 comprised of similarly situated persons so that the factor motivating the alleged 28 discrimination can be identified. Id. at 1166-67. "An equal protection claim will not lie by

9

conflating all persons not injured into a preferred class receiving better treatment than the plaintiff." Id. at 1167 (internal quotation and citation omitted). Evidence of different treatment of unlike groups does not support an equal protection claim. Id. at 1168.

As an initial matter, plaintiff claims defendants treated him differently than a similarly situated group consisting of all general population inmates who were approved to receive special religious, i.e., vegetarian, dietary meals. Defendants argue, however, that the relevant group for comparative purposes consists of those inmates whom defendants did not know had been approved to receive vegetarian meals for religious or other reasons. The Court agrees. The undisputed evidence shows that defendants, at the time of the incident, did not know plaintiff's vegetarian meal status; consequently, plaintiff was not similarly situated to all other inmates who were approved to receive special religious vegetarian meals. Further, the evidence does not show defendants treated plaintiff differently than other inmates whom defendants did not know had been given vegetarian meal chronos; specifically, there is no evidence that defendants served a vegetarian meal to anyone whom they did not know was approved to receive one.

Plaintiff also maintains that defendants denied him a vegetarian meal either because he practices Shetaut Neter or because defendants thought he was Muslim, or, alternatively, because of his race. The undisputed evidence shows, however, that defendants, having never previously interacted with plaintiff, were unaware of plaintiff's religious affiliation at any time before or during the incident. Further, the undisputed evidence shows that defendants provided vegetarian meals to all other inmates whom they knew had been approved to receive such meals, regardless of their race or religious affiliation, including African-American and Muslim prisoners. As plaintiff has not raised a triable issue with respect to whether he was treated differently than similarly situated individuals, his equal protection claim necessarily fails.

Moreover, plaintiff's claim fails for the additional reason that there is no evidence to support a finding that defendants' treatment of plaintiff was discriminatory. Without evidence of discriminatory intent, a plaintiff cannot make out an equal protection claim for

10

discrimination based on a suspect classification. <u>Thornton</u>, 425 F.3d at 1168; <u>see</u> <u>More v. Farrier</u>, 984 F.2d 269, 271-72 (8th Cir. 1993) (holding prisoner claiming equal protection violation must allege invidiously dissimilar treatment to that received by other inmates).

Here, plaintiff's claim of discriminatory intent based on his religious affiliation fails as a matter of law because, as discussed, there is no evidence that defendants knew plaintiff's religious status before or during the incident. Nor is there any merit to plaintiff's contention that defendants intentionally discriminated against him on the ground they thought he was Muslim and/or because he is African-American. Rather, the undisputed evidence shows Morales and Soto denied plaintiff a vegetarian meal because they did not know he was authorized to receive one and, in accordance with defendants' training, vegetarian meals are only provided to inmates who have been approved to receive them.[3] Further, a lack of invidious discrimination on the part of Morales is demonstrated by his attempt to confirm plaintiff's meal status with Soto before refusing to serve plaintiff a vegetarian meal.

Based on the above, the Court concludes plaintiff has failed to raise a triable issue of fact with respect to whether defendants intentionally refused to provide him with a religious breakfast tray while providing the same to other inmates who were similarly situated.

Accordingly, summary judgment will be granted in favor of defendants on plaintiff's equal protection claim.

3. <u>Excessive Force Claim</u>

Plaintiff claims defendants Morales and Sullivan used excessive force in violation of the Eighth Amendment when they pepper sprayed him without justification after he asked to speak to a supervisor and placed his arm on the food port in order to balance himself.[4]

Defendants argue they are entitled to summary judgment because there are no genuine issues of material fact with respect to whether they used excessive force and also because

---

[3]There is no contention that Sullivan was involved in providing the breakfast tray to plaintiff.

[4]It is undisputed that Soto did not pepper spray plaintiff and there is no allegation that he failed to intervene to prevent the use of excessive force.

11

they are entitled to qualified immunity. The defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The rule of qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." Burns v. Reed, 500 U.S. 478, 495 (1991) (quotation and citation omitted).

A court considering a claim of qualified immunity must determine whether the plaintiff has alleged the deprivation of an actual constitutional right and whether such right was clearly established such that it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. Pearson v. Callahan, 129 S. Ct. 808, 818 (2009). Regarding the deprivation of a constitutional right, the threshold question must be: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" Saucier v. Katz, 533 U.S. 194, 201 (2001). The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. Id. If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate. Id. at 202.

      a.    <u>Deprivation of a Constitutional Right</u>

Whenever prison officials stand accused of using excessive force in violation of the Eighth Amendment, the core judicial inquiry is whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm. Hudson v. McMillian, 503 U.S. 1, 6-7 (1992). In determining whether the use of force was for the purpose of maintaining or restoring discipline, or for the malicious and sadistic purpose of causing harm, a court may evaluate the need for application of force, the relationship between that need and the amount of force used, the extent of any injury inflicted, the threat reasonably perceived by the responsible officials, and any efforts made to

temper the severity of a forceful response. Id. at 7. A prisoner need not allege he suffered serious injury in order to establish an Eighth Amendment violation. Id.

Defendants argue they cannot be found to have acted with the malicious and sadistic purpose of causing harm to plaintiff because, according to defendants, the undisputed evidence shows the following: (1) after Morales spoke with Officer Soto to confirm whether plaintiff was approved to receive a vegetarian meal and attempted, for the second time, to serve plaintiff a non-vegetarian food tray, plaintiff blocked the food port from being closed; (2) in accordance with OP 29, SVSP's operational procedures concerning food/handcuff ports,[5] Morales then commanded that plaintiff let go of the food port and, when plaintiff did not so, Morales pepper sprayed him; (3) when Morales ran out pepper spray, Officer Sullivan used his pepper spray on plaintiff and also commanded plaintiff to let go of the food port; (4) plaintiff heard defendants' commands to release the food port but did not do so until he was pepper sprayed by Sullivan; and (5) shortly after the incident, plaintiff saw an MTA but did not complain to the MTA about any injuries or request any medical assistance; he then

---

[5]The version of OP 29 in effect at the time of the events at issue herein provides, in relevant part:

> Inmates who take control of food/cuff ports create a serious immediate safety concern for staff and other inmates and mandates suspension of the programming of the other inmates housed in the unit. This seriously impacts the ability of staff to provide services as required by law and departmental policy. It is imperative that the food/cuff port be secured in short order to enable inmates to continue to receive services.
>
> If during routine duties, correctional officers encounter an inmate who refuses to allow staff to close and lock his food/cuff port, the officers will verbally order the inmate to relinquish control of the food port and allow staff to secure it. The officer shall issue a warning that chemical agents will be used if he does not comply.
>
> If the inmate refuses to relinquish control of the food port, despite the warning, the officer is authorized to administer chemical agents against the inmate to secure the food port.
>
> If the inmate relinquishes control of the food port it will be secured and health care staff will follow in-cell decontamination procedures.

(Morales Decl. Ex. 1.)

decontaminated himself in his cell.

In opposition, plaintiff claims the evidence shows force was not used in a good-faith effort to maintain or restore discipline because (1) defendants did not comply with OP 29 when they pepper sprayed plaintiff without any warning, (2) plaintiff posed no threat to the safety or security of defendants or anyone else by holding the food port open when he was confined behind a closed steel door, and (3) Morales and Sullivan each discharged a full canister of pepper spray at plaintiff.

The Court finds plaintiff has raised a triable issue of material fact with respect to whether Morales first warned plaintiff to let go of the food port before pepper spraying him. Although Morales's alleged failure to comply with OP 29 does not, standing alone, evidence the violation of plaintiff's constitutional rights, whether Morales first warned plaintiff to let go of the food port before using the pepper spray arguably is relevant to determining the reasonableness of Morales's actions. Additionally, while it is undisputed that Sullivan did not start pepper spraying plaintiff until after Morales had shouted at plaintiff to let go of the food port and plaintiff had refused to do so, plaintiff has raised a triable issue of material fact with respect to whether plaintiff's actions posed a threat, such that Morales and Sullivan were justified in responding with the use of force.

The Court finds, however, that plaintiff has not raised a triable issue with respect to the amount of pepper spray used by Morales and Sullivan. In particular, although plaintiff surmises, based on speculation, that defendants discharged two full canisters of pepper spray at him, he provides no evidence to substantiate his assertion. By contrast, Morales avers in his declaration that he discharged a one-second burst of pepper spray at plaintiff and then stopped because his canister lacked pressure, (Morales Decl. ¶ 9), and Sullivan avers in his declaration that after he saw Morales struggling with his own pepper spray canister, Sullivan dispersed one burst of pepper spray at plaintiff and stopped pepper spraying as soon as plaintiff released the food port. (Sullivan Decl. ¶¶ 7-8.)

      b.     <u>Reasonableness of Defendants' Conduct</u>

Even if there are genuine issues of material fact in dispute with respect to whether

14

defendants used excessive force, defendants may be entitled to qualified immunity if, viewing the facts in the light most favorable to plaintiff, defendants could have reasonably believed they were not violating the law. See Marquez v. Gutierrez, 322 F.3d 689, 693 (9th Cir. 2003). The qualified immunity inquiry is separate from the Eighth Amendment excessive force inquiry. Id. Thus, a prison guard can do an act that violates an inmate's Eighth Amendment right to be free from the use of excessive force and nonetheless be entitled to qualified immunity if a reasonable officer in his position would have believed his response was necessary to restore discipline. See id. (finding guard entitled to qualified immunity even if plaintiff's facts would establish use of excessive force, because reasonable officer in guard's position could mistakenly believe plaintiff and second inmate were threatening third inmate with serious injury or death, thus requiring use of force against plaintiff).

Here, defendants do not dispute that, at the time of the events giving rise to the instant action, it was clearly established that a correctional officer may not use force against a prisoner who poses no threat to the safety or security of the institution. Defendants maintain, however, they are entitled to qualified immunity because they reasonably believed their acts were lawful and, even if the events transpired as plaintiff claims, a reasonable officer in their situation would have believed the force used was not in violation of plaintiff's constitutional rights. The Court agrees.

Specifically, a reasonable officer in Morales's position who had received training regarding the serious safety concerns raised by inmates who take control of food ports could have mistakenly but reasonably perceived that when plaintiff held open the food port, after being directed by Morales to take the breakfast trays but refusing to do so, he posed a threat to the safety and security of the institution. Further, Morales reasonably could have believed, based on plaintiff's actions as well as Morales's unfamiliarity with plaintiff and Morales's difficulty in balancing the food trays, that it was lawful for him to respond to the situation by discharging a burst of pepper spray before shouting to plaintiff to release the food port. Similarly, a reasonable officer in Sullivan's position, seeing Morales struggling with the

1 trays, seeing plaintiff had refused to let go of the food port after Morales told him to do so, 2 and seeing Morales pepper spraying plaintiff, could have mistakenly but reasonably believed 3 that plaintiff posed a threat and that it was lawful to respond to the situation by discharging 4 his pepper spray into plaintiff's cell, shouting at plaintiff to release the food port, and ceasing 5 to pepper spray plaintiff as soon as plaintiff did so.

6 Based on the above, the Court concludes that even if Morales and Sullivan can be 7 deemed to have used excessive force when they pepper sprayed plaintiff, each of said 8 defendants is entitled to qualified immunity based on the reasonableness of their beliefs as to 9 the need for the use of force.

10 Accordingly, defendants will be granted qualified immunity on this claim.

## CONCLUSION

12 For the reasons stated above, defendants' motion for summary judgment is hereby 13 GRANTED and judgment shall be entered in favor of all defendants.

14 This order terminates Docket No. 21.

15 The Clerk shall close the file.

16 IT IS SO ORDERED.

17 DATED: March 31, 2010

MAXINE M. CHESNEY
United States District Judge